FILED

2014 Feb-06  AM 10:31
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| TAMMY D. PHILLIPS, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No.  5:13-cv-00107-HGD |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER, SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION

In this action under 42 U.S.C. 405(g), plaintiff seeks judicial review of an adverse social security ruling which denied claims for disability insurance benefits (hereinafter DIB) and Supplemental Security Income (hereinafter SSI). (Doc.1). The parties filed written consent and this action has been assigned to the undersigned Magistrate Judge to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73.  (*See* Doc. 12).  Upon consideration of the administrative record and the memoranda of the parties, the court finds that the decision of the Commissioner is due to be affirmed and this action dismissed.

## I.      Proceedings Below

Plaintiff filed an application for a period of disability and disability insurance benefits on December 8, 2006, in which she alleged that she became unable to work on December 2, 2006. (Tr. 88-99, 106). These claims were initially denied. (Tr. 63-64, 74-75, 84-86). On March 27, 2007, plaintiff requested a hearing before an Administrative Law Judge (ALJ), which took place on December 2, 2008. On February 13, 2009, the ALJ issued a decision denying plaintiff's application. (Tr. 19-28). The Appeals Council denied plaintiff's request for review. (Tr. 1-3). After the Appeals Council denied plaintiff's request for review of the ALJ's decision, that decision became the final decision of the Commissioner and, therefore, a proper subject of this court's appellate review. 42 U.S.C. §§ 405(g), 1383(c)(3).

## II.     ALJ Decision

Disability under the Act is determined under a five-step test. 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial work activity" is work that involves doing significant physical or mental activities. 20 C.F.R. § 404.1572(a). "Gainful work activity" is work that is done for pay or profit. 20 C.F.R. § 404.1520(b). Second, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that

significantly limits the claimant's ability to perform basic work activities.  20 C.F.R. § 404.1520(a)(4)(ii).  Absent such impairment, the claimant may not claim disability.  *Id.*  Third, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(d), 404.1525 and 404.1526.  If such criteria are met, the claimant is declared disabled.  20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ still may find disability under the next two steps of the analysis.  The ALJ first must determine the claimant's residual functional capacity (RFC), which refers to the claimant's ability to work despite her impairments.  20 C.F.R. § 404.1520(e).  In the fourth step, the ALJ determines whether the claimant has the RFC to perform past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant is determined to be capable of performing past relevant work, then the claimant is deemed not disabled.  *Id.*  If the ALJ finds that the claimant is unable to perform past relevant work, then the analysis proceeds to the fifth and final step.  20 C.F.R. § 404.1520(a)(4)(v).  In the last part of the analysis, the ALJ must determine whether the claimant is able to perform any other work commensurate with her RFC, age, education and work experience.  20 C.F.R. § 404.1520(g).  Here, the burden of proof shifts from the claimant to the ALJ to prove

the existence in significant numbers of jobs in the national economy that the claimant can do given the RFC, age, education and work experience.   20 C.F.R. §§ 404.1520(g), 404.1560(c).

The Administrative Law Judge strictly followed this protocol in evaluating plaintiff's allegations of disability.   Evidence reflects that plaintiff was 39 years old at the time of the Commissioner's decision on February 13, 2009.  (Tr. 27, 34).  She had a high school education and had previously worked as a fast-food worker, creeler, and spinner operator.[1]  (Tr. 35-36).  Plaintiff alleges that she has been unable to work since December 2, 2006, when she quit or was fired from her last job because of bipolar disorder, depression and obsessive compulsive disorder (OCD). (Tr. 34, 111).

The ALJ held that plaintiff has the residual functional capacity to perform a full range of work at all exertional levels but with certain non-exertional limitations.  He held that plaintiff can remember/carry-out simple instructions, but no detailed tasks or instructions.  She can maintain attention and concentration for two-hour periods across an eight-hour workday.  He noted that a well-spaced work environment would be best.  Furthermore, the ALJ found that any contact with the public by plaintiff should be infrequent and non-intensive.  Supervision should be tactful, constructive and non-threatening.  According to the ALJ, plaintiff needs a "low stress" job,

---

[1] Creelers and spinners are jobs in the textile industry.

meaning one with an Specific Vocational Preparation (SVP) of 2 or less, involving only simple work-related decisions.  (Tr. 23).

Using these limitations to form a hypothetical question for a vocational expert (VE), the ALJ asked the VE whether jobs exist in the national economy for an individual with the claimant's age, education, work experience and residual functional capacity.  The VE testified that given all of these factors, the individual would be able to perform the requirements of representative unskilled light occupations such as laundry sorter, sewing machine operator, and assembler.  (Tr. 28).  Based on this, the ALJ concluded that plaintiff is capable of making a successful adjustment to other work in the national economy, resulting in a finding that plaintiff is "not disabled."  (*Id.*).

## III.   Plaintiff's Argument for Reversal

Plaintiff seeks to have the Commissioner's decision reversed.  Specifically, plaintiff asserts that the ALJ's mental findings as they relate to plaintiff's RFC are not based on substantial evidence.  Plaintiff points to the opinion of treating psychologist, Dr. Patrick Quirk, Psy.D., who assessed plaintiff on September 5, 2007, and December 3, 2008, with marked or greater limitations in all mental work areas including social functioning, responding to customary work pressures, supervision and co-workers, and performing repetitive tasks, as well as a marked restriction in

activities of daily living, maintaining concentration, persistence and pace and in understanding, remembering, and carrying out instructions and performing simple tasks.  (Tr. 290-91, 317-18).

## IV.    Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied.  *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Brown*, 792 F.2d 129, 131 (11th Cir. 1986).  Title 42 U.S.C. § 405(g) mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The district court may not reconsider the facts, re-evaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence.  *See id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted).  If supported by substantial evidence, the

Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

## V.   Discussion

Plaintiff asserts that the medical opinions of treating psychologist, Dr. Quirk, were not given sufficient consideration by the ALJ. "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). Absent "good cause," an ALJ is to give the medical opinions of treating physicians "substantial or considerable weight." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *see also* 20 C.F.R. §§ 404.1527(d)(1)-(2), 416.927(d)(1)-(2). Good cause exists "when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Comm'r of Soc. Sec.*, 357 F.3d 1232, 1241 (11th Cir. 2004). Additionally, the claimant's daily activities can

contradict the treating physician's opinion and lessen its credibility. *See id.* "The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error." *Lewis*, 125 F.3d at 1440. If the ALJ does state specific reasons, however, failure to give the treating physician's opinion controlling weight is not reversible error so long as it is supported by substantial evidence. *See Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005) (*per curiam*).

In his decision denying plaintiff disability benefits, the ALJ noted the following:

> The claimant alleges disability due to bipolar disorder and obsessive compulsive disorder with acid reflux. She claims difficulty with these since 1987, with date last worked in December 2006 when she was fired for not going to work often enough. (Exhibit 3E). The claimant's mother reported in January 2007 that throughout her whole life the claimant had variable sleeping patterns and depending on her mood she was able without assistance to care for personal needs, do cleaning and laundry, but rarely cooked and only went outside the house about once a week. The claimant read a lot (daily read books and occasionally the newspaper), watched movies (two to four hours a day) and worked in the flower garden; only sometimes did she remember what she had watched/listened to/read. She had no problems getting along with others unless she was "in her mood swings," and during mood swings the claimant showed anger, cursing, and throwing and breaking items. If a mood swing happened she would finish tasks. She feared death, reported hearing voices, and had thoughts of suicide (Exhibit 6E). At the hearing in December 2008, the claimant testified that she went on a break from work in December 2006 and never went back; she had things in her mind about her coworkers. She had not looked for work since and

had moved back in with her parents (in fact the record indicates the claimant moved back in with her parents in about 2001). She reported only infrequently going shopping with her mother or driving, claiming that she could not get out around people; she had thoughts about them talking about her and this was the same problem she had with coworkers. The longest job she had ever held lasted four years; she had not tried to work at all since December 2006. Her medications only cost $5.00 a bottle; her therapist (Dr. Quirk) recommended medications that were prescribed by her primary care physician (Dr. Blevins). Most days her medications (currently listed as Celexa, Seroquel, Lamictal, and Nexium, Exhibit 14E) worked but she admitted that for the few days before the hearing they had not worked well because she was stressed about the upcoming hearing. She admitted to her past history of substance abuse, stating that she finally understood that she had been self-medicating for many years. Although she was now better, she still had days every week when she could not even leave the house; previously, this occurred every day and constantly.

(Tr. 23-24).

The ALJ found that claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms but that her and her mother's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above RFC. (Tr. 24).

In reaching this conclusion, the ALJ stated that she gave little weight to the opinions of Dr. Quirk set forth in August and September 2007 (Exhibit 10F) and in December 2007 (Exhibit 13F) that plaintiff has marked or extreme functional limitations in all listed areas of mental functioning and that she is "simply incapable

of maintaining gainful employment."   The ALJ stated that he rejects Dr. Quirk's opinions because they are "not supported by the balance of the record."   (*Id.*).

The ALJ noted that plaintiff had been seeing Dr. Quirk since April 19, 2007, just a couple of weeks after the Social Security Administration denied her claim for disability.   He saw plaintiff a total of 12 times through early November 2008. According to the ALJ, the treatment notes consistently indicate that plaintiff reported a long history of "progressively building paranoia and ideas of conspiracy" since her late teens and early 20s, with complaints of frequent auditory hallucinations and occasional visual hallucinations, as well as delusions and panic attacks which were worse when she was working.  Dr. Quirk administered a Minnesota Multiple Personal Inventory-2, but her infrequency scale was elevated to the point that the test was not scoreable.   Dr. Quirk diagnosed plaintiff with bipolar disorder I and/or paranoid schizophrenia.

The ALJ also noted that, in May 2007, plaintiff reported periods of hyperness lasting five to six days followed by depressed periods, but she did not indicate how often these periods occurred or really the intensity of symptoms during that period. (Tr. 24-25).  The ALJ noted further, however, that Dr. Quirk's treatment records also indicate plaintiff reported that medications helped her sleep quite a bit.  In July 2007, plaintiff also reported that the Lamictal was really helping.  In subsequent office

visits, plaintiff reported that she was actually taking care of her mother during her mother's own emotional crises. Importantly, the ALJ noted that Dr. Quirk's opinion appeared to be based solely on plaintiff's reports to Dr. Quirk and little, if any, observations by Dr. Quirk about how plaintiff actually was functioning during the period when he actually saw her. It is also unclear whether Dr. Quirk ever did a mental status examination.

In setting out why he did not credit the opinions of Dr. Quirk, the ALJ stated:

In contrast, there are records going back to 1995 and through March 2007 that convincingly show that the claimant functioned much better, especially in the absence of substance abuse, despite her allegations of constant daily decompensation. The claimant reportedly was treated by a psychiatrist for some time in 1994 but it did not help because she was drinking at that time (Exhibit 3F). As already noted, the claimant was treated for polysubstance abuse in 1995; at that time a history of depression and anxiety were also noted; only some nervousness was noted during the interview and there was only an indication of mild depression. Overall, including the substance abuse, her GAF was assessed at 50-55 at that time (Exhibit 1F). The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders: DSM-IV 34 (4th ed., text revision 2000) states that a GAF of 41-50 indicated serious mental limitations, while a GAF of 51-60 indicated no more than moderate mental limitations.

The claimant has worked a number of jobs; notably in the early to mid 1990's she had worked at Shaw Industries (where she worked as a creeler) for several years, earning as much as $17,000 in 1994 and over $14,000 in 1995 (Exhibits 4D and 4E). In 2001, she sought treatment for depression and panic disorder, and was diagnosed with bipolar disorder with mild psychotic ideation and obsessive compulsive disorder by Mary Traynor, M.D., another psychiatrist. She had been back at Shaw Industries since 1999, and although reporting in April 2002 that

she was on probation from her job for absenteeism, mental status examination only showed that claimant was "somewhat labile" and the following month she admitted to abusing crystal meth (Exhibit 3F), and also had treatment for polysubstance abuse for a couple of months after that (Exhibit 4F). Despite all this substance abuse and her additional emotional problems, the claimant's primary abnormality during that 2002 substance abuse treatment was a "dysphoric mood," and she was noted as being very interactive, responsive, attentive, and constructive during group sessions (she was in an intensive outpatient program), and nothing was noted about mood swings or not getting along with staff or other patients (Exhibit 4F). In 2000 she earned $17,598, in 2001 $13,897, and in 2002 $13,295 at Shaw (Exhibits 4D and 4E).

(Tr. 25).

The ALJ also noted that there was as gap in plaintiff's treatment records from July 2002 until March 2004, when she returned to Dr. Traynor and reported that in the interim she had gotten back on drugs but had been clean for one and a half years and had recently been treated for depression although she was then working a very stressful position as a manager of a fast-food restaurant for 50-60 hours per week. She reported that she was doing really well and just needed a psychiatrist to oversee the various medications she was taking. (Exhibit 3F). In December 2004, she was working full time. She reported that she lapsed and drank a few beers and smoked pot in October 2004, even though she reported that she had stopped taking her psychotropic medications in July 2004 (five months earlier) and had had some paranoid thinking and missed several days of work due to depressed mood and racing thoughts. Although she had a dysphoric mood and reported passing thoughts of

suicide, but no plans, she had an appropriate affect, was calm, had normal orientation, had no indication of ay psychosis, and was assessed with a GAF of 52 (Exhibit 4F).

Plaintiff tested positive for opiates and marijuana in March 2005 and was diagnosed with abuse of those substances. (*Id.*).  Her primary physician at that time, Dr. Blevins, noted only that claimant was taking Seroquel and Effexor for depression in May 2005 and that there were some unspecified "problems with anti-depressant," a diagnosis of bipolar disorder, and an increase in Seroquel in late December 2006. (Tr. 26).

During a consultative examination in March 2007 with Dr. Mary Arnold, Psy.D., a licensed psychologist, plaintiff reported that medications calmed her down when she was really hyper and helped her focus better.  Plaintiff has been living with both parents since 2001 and reported no problems getting a job, just keeping one due to anger issues.  She claimed that she lost her job in December 2006 due to not returning to her job after getting into an argument away from the job.  Dr. Arnold noted that plaintiff was neatly groomed and attired, had a composed demeanor, and her social skills and behavior were appropriate to the situation.  Her mood was broad with congruent affect.  According to Dr. Arnold, plaintiff was alert and oriented  in all spheres, was able to mentally calculate problems in subtraction, multiplication and division, repeated six digits forward and four digits backward, counted backward

from 20, and recited serial 7s.  She also was able to recite the months of the year

forward/backward in sequence and recalled three of three objects after a five-minute

delay.  She made eye contact , did not exhibit tangential or circumstantial thinking,

and her response times were within the normal range.  Dr. Arnold also noted that

plaintiff performed daily activities independently, including cleaning and doing

dishes and laundry, and went out to eat on occasion (a family birthday), watched her

son play pool, read self-help books, watched television, and drove herself to the

examination.  Dr. Arnold diagnosed plaintiff with bipolar disorder and assessed a

GAF of 59 (Exhibit 7F).  (Tr. 26).

The ALJ explained the weight he gave to this medical evidence as follows:

The undersigned gives great weight to Dr. Arnold's assessment of a
GAF of 59, indicating no more than moderate mental impairment.  This
assessment is consistent with Dr. Arnold's detailed findings and
observations during her examination of the claimant showing good
cognitive functioning and social interaction and rebuts the claimant's
allegations at the hearing that previously she had almost constant
decompensation.  Dr. Arnold's assessment is also consistent with the
claimant's good work history for extended periods of time despite some
substance abuse and pre-existing problems with depression/anxiety
(later diagnosed as bipolar disorder).  Although the claimant states that
her thoughts about other people led her into arguments and/or to miss
work, making it impossible for her to keep jobs for long periods of time,
even when she was having the most problems with substance abuse
there was no indication of any abnormal level of anger or ability to get
along with other people.  So no matter how the claimant might interact
with family members, the alleged difficulties with people especially in
the workplace are not supported. Dr. Quirk's opinions of marked and/or
extreme mental limitations are based on the claimant's reports of

symptoms, and apparently not on any observed symptoms, and those opinions are contradicted by the rest of the evidence. The undersigned gives great weight to the state agency medical consultant opinion in March 2007 that the claimant only had mild or moderate mental limitations with functional restrictions as set forth above (Exhibit 9F); that opinion is strongly supported by all of the evidence–overall no more than moderate dysfunction through examination by Dr. Arnold in March 2007, and no real evidence of any deterioration in functioning since then. The claimant's current ability to function well even in stressful circumstances is evidenced by her testimony at the hearing in December 2008 that despite not doing well for the past few days due to anticipating the hearing, she remembered last seeing Dr. Quirk on November 4th or 5th; Dr. Quirk's records show he saw her on November 5th.

(Tr. 26-27).

After considering all the evidence presented and the ALJ's written reasons for his determination that plaintiff is not disabled, it is clear that this opinion is supported by substantial evidence. The ALJ is responsible for evaluating the medical evidence and determining plaintiff's RFC. *See* 20 C.F.R. §§ 404.1546(c), 416.946(c); *Walker v. Bowen*, 826 F.2d 996, 1000 n.1 (11th Cir. 1987). In making this determination, the ALJ is charged with the duty to weigh the evidence, resolve material conflicts in testimony, and determine the case accordingly. *See Wheeler v. Heckler*, 788 F.2d 1073, 1075 (11th Cir. 1986).

As noted by the ALJ, Dr. Quirk's opinion that plaintiff suffered from marked or extreme mental limitations is not supported by the record evidence. The ALJ noted that medical records from 1995 through March 2007 demonstrate that plaintiff

functioned much better than reported by Dr. Quirk, particularly when she was not abusing drugs or alcohol. (Tr. 25, 200-01, 203-06, 208-12). Likewise, Dr. Quirk's progress notes reflect that plaintiff's medications helped her, particularly with sleep issues. (Tr. 25). During the consultative examination in March 2007 with Dr. Arnold, plaintiff reported that medications calmed her down when she was really hyper and helped her focus better. (Tr. 26). In July 2007, plaintiff also reported that the Lamictal was really helping. In subsequent office visits to Dr. Quirk, plaintiff reported that she was actually taking care of her mother during her mother's own emotional crises. (Tr. 26). In addition, Dr. Quirk's opinion that plaintiff had marked restrictions in her activities of daily living is also not supported by the record, which demonstrates that plaintiff performs household chores, cares for her personal needs, drives, reads books and watches television. (Tr. 23-24, 36-38, 129, 135-36, 290, 317).

Further undermining Dr. Quirk's opinion is the fact that his conclusions appear to be based on plaintiff's own reports of symptoms rather than observed symptoms. (Tr. 25-26). Dr. Quirk's opinions are also undermined by the report of the consultative examiner, Dr. Mary Arnold, Psy.D. Dr. Arnold evaluated plaintiff in March 2007 and observed that she had a composed demeanor and appropriate social skills and behavior. (Tr. 267). Mental status findings provided no evidence of

delusions or hallucinations.  (Tr. 267-68).  Dr. Arnold also noted that plaintiff performed activities of daily living independently, including cleaning, doing dishes and laundry, and reading books and watching television.  (Tr. 268).  Dr. Arnold assessed plaintiff with Bipolar I Disorder and assigned a global assessment functioning (GAF) score of 59.[2]

Dr. Arnold's assessment, to which the ALJ assigned great weight, provides substantial evidence to support the ALJ's RFC determination and further undermines Dr. Quirk's opinions.  As noted by the ALJ, Dr. Arnold's assessment of plaintiff's GAF is consistent with her detailed examination findings and observations, which reflect that plaintiff has good cognitive functioning and social skills.  (Tr. 26, 267-68).  Dr. Arnold's findings are also consistent with plaintiff's work history which, despite her problems with substance abuse, depression and anxiety, was reasonably good for some extended periods of time.  (Tr. 26, 104-05).  Thus, there is substantial evidence to support the ALJ's determination to give little weight to the opinions of Dr. Quirk and great weight to the assessment of Dr. Arnold.

There is substantial evidence to support the ALJ's decision to give great weight to the opinion of the State agency psychiatric consultant, Dr. Robert Estock, M.D.

---

[2] A GAF score of 51-60 represents moderate symptoms (*e.g.*, flat effect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).  *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders,* 32-34 ($th ed. 2000, Text Rev.).

(Tr. 26-27).  State agency consultants are highly qualified specialists who are experts in the Social Security disability programs.  Their opinions may be entitled to great weight if the evidence supports their opinions.  *See* 20 C.F.R. §§ 404.1527(e)(2)(I), 416.927(e)(2)(I); Social Security Ruling (SSR) 96-6p, 1996 WL 374180 (S.S.A.).[3]

Dr. Estock reviewed the record, including Dr. Arnold's evaluation, and completed a Psychiatric Review Technique (PRT) and mental RFC assessment in March 2007.  (Tr. 270-86).  Dr. Estock concluded that plaintiff had only mild or moderate limitations in all areas of mental functioning.  (Tr. 280, 284-85).  Dr. Estock concluded, in his Functional Capacity Assessment, that plaintiff could be expected to understand, remember, and carry out short, simple instructions and tasks, but would likely have difficulty with more detailed tasks and instructions; she could be expected to maintain attention and concentration for two hours with all customary rest breaks, and a well-spaced work environment would provide for maximum concentration; her contact with the public should be infrequent and non-intensive; supervision should be tactful, constructive and non-threatening; and changes in the workplace should be infrequent and gradually introduced.  (Tr. 286).  The ALJ

---

[3] In unpublished opinions, the Eleventh Circuit has stated that ALJs must weigh the opinions of state agency physicians under the Commissioner's regulations.  *See Wainwright v. Comm't of Soc. Sec.*, 2007 WL 708971, at *2 (11th Cir. March 9, 2007) (finding ALJ was entitled to reject opinion of examining psychologist because he had examined claimant on only one occasion and his opinion was contrary to opinions and assessments of state agency psychologists).

considered these limitations and properly incorporated them into plaintiff's RFC. (Tr. 23, 26-27).

Dr. Estock provided a detailed summary of the evidence that he reviewed, which reflects some limitations in plaintiff's concentration, memory and social functioning, but no more than moderate dysfunction in any area. (Tr. 27, 282). Therefore, the ALJ properly gave great weight to Dr. Estock's opinions, which provide substantial evidence to support the ALJ's assessment of plaintiff's RFC.

In summary, the ALJ properly explained his reasons for giving little weight to the opinions of Dr. Quirk. Substantial evidence, including plaintiff's medical records, assessments by Dr. Arnold and Dr. Estock, and plaintiff's statements about her symptoms, supports the ALJ's RFC finding regarding plaintiff's limitations. *See* 20 C.F.R. §§ 404.1529, 416.929. Because there is good cause to discount the treating psychologist's opinions, the ALJ acted within his authority by discounting Dr. Quirk's opinion while giving "substantial weight" to those conclusions that are consistent with the ALJ's RFC findings. *Phillips*, 357 F.3d at 1241.

Plaintiff also complains that the ALJ's references to her history of substance abuse were improper. However, the analysis of whether substance abuse was a material, contributing factor to a finding of disability is triggered only if the ALJ first finds that the claimant is disabled. *See* 20 C.F.R. §§ 404.1535, 416.935; SSR 13-2p,

2013 WL 621536 (S.S.A.).  The ALJ did not find plaintiff to be disabled.  Because plaintiff was not found to be disabled, the ALJ was not required to consider whether plaintiff's history of substance abuse was a contributing factor material to a finding of disability.  The only consideration given plaintiff's history of substance abuse by the ALJ was in consideration of her credibility as a witness and the fact that, despite this history, she was able to function socially and maintain employment.  The fact that she was able to function relatively well even when she was having substance abuse problems tended to discount her claim that her mental condition was such that she was marked to severely mentally impaired.

Additionally, the ALJ noted that plaintiff testified that she had not used alcohol in five to ten years.  This was contradicted by her medical records.  This, according to the ALJ, raised a question regarding her credibility.  (Tr. 22, 47, 199).  This testimony was properly considered for such a purpose.  *See Arnold v. Astrue*, 2012 WL 3030564, at *7 (N.D.Ala. July 23, 2012) (ALJ properly discredited claimant's testimony regarding severity of his impairments based on inconsistent statements concerning alcohol and substance abuse).

Plaintiff also asserts that the ALJ should have considered utilizing a medical advisor or expert to assist him in determining plaintiff's RFC.  However, an ALJ is not required to obtain such services if it is not necessary to enable the ALJ to make

a disability determination. *See Wilson v. Apfel*, 179 F.3d 1276, 1278 (11th Cir. 1999) (holding that additional medical testimony was unnecessary where the record was sufficient for decision).  Here, the ALJ considered and relied upon the opinion of the State agency psychiatric consultant, Dr. Estock, in determining plaintiff's RFC.  Thus, a medical advisor was unnecessary.

## VI.    Conclusion

Accordingly, upon review of the administrative record, and considering all of plaintiff's arguments, the Court finds the Commissioner's decision is supported by substantial evidence and in accord with the applicable law.  Therefore, that decision is to be AFFIRMED.  A separate order will be entered.

DONE this 6th day of February, 2014.

HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE